JP:RTP

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**13 M 0991**

 — — — — — — — — — — — — — — — — — — — — X

IN THE MATTER OF AN APPLICATION
FOR A SEARCH WARRANT FOR:

AFFIDAVIT IN SUPPORT
OF APPLICATION FOR A
SEARCH WARRANT

THE PREMISES KNOWN AND
DESCRIBED AS (1) MOTOROLA i570
CELL PHONE; IMEI NUMBER
001702054896780; (2) SAMSUNG
METROPCS, IMEI NUMBER
A000001EA04D20; (3) SONY ERICSSON
CELL PHONE, SERIAL NUMBER
BX900HAA6W; AND (4) MOTOROLA
CELL PHONE, ESN NUMBER 80643145

 — — — — — — — — — — — — — — — — — — — X

EASTERN DISTRICT OF NEW YORK, SS:

      PAUL STRAFACI, being duly sworn, deposes and states that he is a Task

Force Officer with the Drug Enforcement Administration, duly appointed according to law

and acting as such.

      Upon information and belief, there is probable cause to believe that there is

located in THE PREMISES KNOWN AND DESCRIBED AS (1) MOTOROLA i570 CELL

PHONE; IMEI NUMBER 001702054896780; (2) SAMSUNG METROPCS, IMEI

NUMBER A000001EA04D20; (3) SONY ERICSSON CELL PHONE, SERIAL NUMBER

BX900HAA6W; AND (4) MOTOROLA CELL PHONE, ESN NUMBER 80643145

(collectively, the "DEVICES"), further described in Attachment A, the things described in

Attachment B, which constitute evidence, fruits and instrumentalities of a conspiracy to

1

distribute and possess with the intent to distribute narcotics, in violation of Title 21, United States Code, Sections 841 and 846.

The source of your deponent's information and the grounds for his belief are as follows:[1]

1.    I am a Task Force Officer with the Drug Enforcement Administration ("DEA"), and I have been employed by the DEA since 2008. I am responsible for conducting and assisting in investigations into the activities of individuals and criminal groups responsible for unlawful narcotics distribution. These investigations are conducted both in an undercover and overt capacity. I have participated in investigations involving search warrants and arrest warrants. As a result of my training and experience, I am familiar with the techniques and methods of operation used by individuals involved in criminal activity to conceal their activities from detection by law enforcement authorities.

2.    I have personally participated in the investigation of the offenses discussed below. I am familiar with the facts and circumstances of this investigation from: (a) my personal participation in this investigation, (b) reports made to me by other law enforcement authorities, (c) information obtained from confidential sources of information, (d) interviews with witnesses, and (e) review of records and reports.

3.    The DEA is investigating a conspiracy to unlawfully distribute and possess with the intent to distribute marijuana.

I.    BACKGROUND

---

[1]    Because this affidavit is submitted for the limited purpose of establishing probable cause for a search warrant, I have not set forth each and every fact learned during the course of the investigation.

4.      Since 2010, the DEA has been conducting an investigation of an international marijuana trafficking organization (the "Organization") that operates in Queens, New York; Atlanta, Georgia; Miami, Florida; Los Angeles, California; and Jamaica, among other places.  The investigation has revealed that the Organization transports marijuana into and out of the New York metropolitan area through freight shipping companies.

5.      In 2010 and 2011, the DEA arrested three members of the Organization who subsequently became cooperating witnesses ("CW1", "CW2" and "CW3", and, collectively, the "Cooperating Witnesses").  The Cooperating Witnesses have each pleaded guilty to conspiring to distribute a controlled substance, in violation of Title 21, United States Code, Section 846, and are cooperating with the government, pursuant to cooperation agreements, in the hopes of receiving lesser sentences.[1]  The Cooperating Witnesses have provided reliable information that has been corroborated by independent evidence.

6.      Through information provided by the Cooperating Witnesses and confidential sources, as well as physical surveillance, the investigation revealed that the Organization, which began in approximately January 2008, purchases 2,000 to 3,000 pounds of marijuana on a monthly basis in Los Angeles, California.  Through freight shipping companies, the Organization then transports the marijuana to locations in New York City; Atlanta, Georgia; and Miami, Florida for distribution to the Organization's customers.  The Cooperating Witnesses have identified HOWARD CLARE as a lieutenant in the Organization who helps transport drug proceeds and store weapons belonging to the

---

[1]      Subsequent to CW1's guilty plea in the Eastern District of New York, the Court authorized CW1's release from pretrial detention on a secured bond and CW1's proactive cooperation with the DEA.

Organization. The Cooperating Witnesses have also identified DEVON CAMPBELL as a

member of the Organization operating primarily in Georgia. According to the Cooperating

Witnesses, CLARE and CAMPBELL were arrested in Atlanta, Georgia in 2010, shortly after

receiving a shipment of marijuana on behalf of the Organization. According to the

Cooperating Witnesses, at the time of his arrest, CLARE was in possession of approximately

$3,000 in drug proceeds. As discussed below, the investigation has revealed that, at the time

of his 2010 arrest in Atlanta, Georgia, CLARE was in possession of approximately $3,000,

as well as the DEVICES.

II.   TECHNICAL TERMS

        a.   **Wireless telephone** (or mobile or cellular telephone): A

handheld wireless device used for voice and data communication through radio signals.

These telephones send signals through networks of transmitter/receivers, enabling

communication with other wireless telephones or traditional "land line" telephones. A

wireless telephone usually contains a "call log," which records the telephone number, date,

and time of calls made to and from the phone. In addition to enabling voice

communications, wireless telephones offer a broad range of capabilities. These capabilities

include: storing names and phone numbers in electronic "address books;" sending, receiving

and storing text messages and email; taking, sending, receiving and storing still photographs

and video; storing and playing back audio files; storing dates, appointments, and other

information on personal calendars; and accessing and downloading information from the

Internet. Wireless telephones may also include global positioning system ("GPS")

technology for determining the location of the device, and a wide variety of applications, also

known as "apps," which may store the user's preferences and other data. Such apps may include Facebook, Twitter and other social media services.

    b. **IP Address:** An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer or other electronic device, such as the DEVICE, that connects to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static-that is, long-term- IP addresses, while other computers have dynamic - that is, frequently changed - IP addresses.

    7. Based on my training, experience, and research, I know that the DEVICES provide not only phone and text message services, but can also be used to take, store and share photographs. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the DEVICES.

III. THE DEVICES

    8. The investigation revealed that, in 2010 and 2011, the Organization used a single-family residence in Queens, New York (the "Office") as the Organization's headquarters for operations in the New York metropolitan area. Through surveillance by members of law enforcement and information provided by the Cooperating Witnesses, the investigation has revealed that multiple members of the Organization resided at the Office during 2010 and 2011. According to the Cooperating Witnesses, members of the Organization, including the Cooperating Witnesses, used the residence of HOWARD

5

CLARE in Queens, New York (the "Residence") to store assault weapons, including numerous AK-47s and Uzi machine guns, as well as proceeds from the sales of marijuana.

9.     HOWARD CLARE processed any marijuana shipments destined for distribution within the New York metropolitan area at the Office. Indeed, images from a pole camera located in the vicinity of the Office show CLARE entering and exiting the Office during 2010. The Cooperating Witnesses further informed the government that members of the Organization, including CLARE, were usually armed with firearms whenever they handled narcotics at the Office.

10.     On or about December 13, 2012, HOWARD CLARE was arrested, pursuant to a criminal complaint. His case is currently pending before the Honorable Sandra L. Townes. See United States v. Clare, 12-CR-792 (SLT).

A. The Searches

11.     Based in part on the information summarized above, on January 28, 2011, the Honorable Ramon E. Reyes, Jr., United States Magistrate Judge for the Eastern District of New York, authorized a search warrant for the Office. On January 31, 2011, law enforcement officers executed the search warrant at the Office. During execution of the search warrant, law enforcement officers located approximately 80 kilograms of marijuana, 6 firearms, and small quantities of cocaine. Following the execution of the search warrant, three members of the Organization were arrested inside the Office. HOWARD CLARE was not present for this search.

12.     Following the execution of the search warrant on the Office, members of law enforcement knocked on the front door of the Residence. A woman ("Jane Doe 1") opened the door and identified herself as the girlfriend of HOWARD CLARE. Doe 1 stated,

in sum and substance, that she resided at the Residence.  After obtaining Doe 1's written consent to search the Residence, members of law enforcement executed a plain view search. Though no contraband was visible, agents observed a construction worker in the basement of the Residence working on what appeared to be four newly-constructed walls.

13.     During February 2011, HOWARD CLARE contacted CW1 by telephone.  This call was not recorded.  During the conversation, CLARE informed CW1 that members of law enforcement had searched the Residence on the same day as the search of the Office, but had not located the stash of weapons.  CLARE further informed CW1 that the stash of weapons would remain inside the Residence and that CLARE had temporarily moved the stash of weapons to the garage of the Residence.

14.     Similarly, CW2 informed the government that, in or around February 2011, HOWARD CLARE secreted numerous assault weapons belonging to the Organization, including AK-47's and Uzi machine guns, in a concealed compartment contained in a recently-installed wall in the Residence.

15.     Based in part on the above, on March 3, 2011, the Honorable Joan M. Azrack, United States Magistrate Judge for the Eastern District of New York, authorized a search warrant for the Residence.  On March 4, 2011, law enforcement officers executed the search warrant at the Residence.  HOWARD CLARE was not present during the search. During execution of the search warrant, law enforcement officers did not locate any weapons or contraband.  However, law enforcement observed multiple walls that appeared to be newly constructed.

B.  The Atlanta Arrest

7

16.     The Cooperating Witnesses have further informed the government that, in approximately June 2010, HOWARD CLARE and DEVON CAMPBELL were arrested in Atlanta, Georgia, after receiving a shipment of marijuana on behalf of the Organization. According to the Cooperating Witnesses, following his arrest in Georgia, CLARE informed the Cooperating Witnesses that he had been arrested by local law enforcement authorities while transporting approximately $3,000 in drug proceeds.

17.     Records from the DeKalb County Police Department in Georgia reflect the following, in sum, substance, and in part. On or about June 10, 2010, police received information from a confidential source that HOWARD CLARE was residing in a stash house for marijuana in DeKalb County, Georgia (the "Stash House"). While performing surveillance on the Stash House, police observed CLARE leave the Stash House and drive away in a vehicle with a suspended license plate number. Police officers then performed a traffic stop on CLARE's vehicle. Incident to the traffic stop, police officers conducted a dog sniff of portions of the vehicle, noted a strong aroma of fresh marijuana in the trunk area of the vehicle and located marijuana residue in the console area. Police officers then arrested CLARE, who was in possession of $3,003 in U.S. currency.

18.     At or around the same time, law enforcement officers observed DEVON CAMPBELL leave the Stash House and drive away in a vehicle. Police stopped the vehicle several blocks later after observing the vehicle commit a traffic infraction. While CAMPBELL exited the vehicle at the direction of law enforcement, a police officer noticed a small plastic bag in CAMPBELL's rear pocket. The officer seized the bag, which contained personal-use quantities of marijuana and tobacco. While frisking CAMPBELL, the police

8

officer found a loaded Glock .40 caliber pistol in CAMPBELL's groin area. CAMPBELL was then arrested.

19.     A property invoice, completed by Detective Joseph Amnicki, indicates that the DEVICES were recovered during the arrests of CLARE and CAMPBELL. The invoice does not specifically allege which of the DEVICES was recovered from which person. However, the invoice makes clear that all of the devices were recovered from either CLARE or CAMPBELL.

20.     At a September 11, 2013 suppression hearing before the Honorable Allyne R. Ross, Detective Ronnie Viar testified about the stop of CLARE. Detective Viar conducted the dog sniff of CLARE's vehicle and assisted in the recovery of property from CLARE. Detective Viar testified that all of the DEVICES were recovered from CLARE following his arrest.

21.     The DEVICES have since been transported to the Eastern District of New York.

22.     Immediately after the stop of CLARE and CAMPBELL, and on the basis of some of the information described above, police officers obtained a judicially-authorized search warrant for the Stash House. On June 10, 2010 at approximately 7:15 p.m., law enforcement officers executed the search warrant. Officers encountered a woman ("Jane Doe 2") in the Stash House who claimed to be the owner of the property and stated that HOWARD CLARE and CAMPBELL paid Doe 2 weekly rent for a room in the Stash House. A search of the room in the Stash House reportedly occupied by CLARE and CAMPBELL yielded two round green shrink-wrapped containers with approximately 65 pounds of marijuana and a shoe box containing $13,300 in U.S. currency.

9

23.    The following circumstances incident to seizure of the DEVICES suggest that the DEVICES contain evidence, fruits and instrumentalities of a conspiracy to distribute and possess with the intent to distribute narcotics, in violation of Title 21, United States Code, Sections 841 and 846: (1) HOWARD CLARE was arrested, while in possession of the Devices, immediately after he left the Stash House, which was found to contain 65 pounds of marijuana and approximately $13,300 in U.S. Currency; (2) the Cooperating Witnesses reported that CLARE was arrested in Atlanta, Georgia in 2010 soon after receiving a marijuana shipment on behalf of the Organization; (3) CAMPBELL, who was also arrested immediately after he left the Stash House, was in possession of small quantities of marijuana and a pistol.

24.    Based on my knowledge, training, and experience, I know that the DEVICES can store information for long periods of time.

IV.    TECHNICAL BACKGROUND

25.    As further described in Attachment B, this application seeks permission to locate not only data that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how the DEVICES were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence can be recovered from the DEVICES because:

a.    Data on an electronic device can provide evidence of a file that was once on the device but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the device that show what tasks and processes were recently active. Web browsers, email programs, and instant

10

messaging/"chat" programs store configuration information on the device that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the device was in use. Electronic devices can record information about the dates files were created and the sequence in which they were created.

           b.     Forensic evidence on an electronic device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, email, email address books, instant messaging or chat logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the electronic device at a relevant time.

           c.     A person with appropriate familiarity with how an electronic device works can, after examining this forensic evidence in its proper context, draw conclusions about how devices were used, the purpose of their use, who used them, and when.

           d.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on an electronic device that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, such evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on an electronic device

is evidence may depend on other information stored on the device and the application of knowledge about how the device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.    Further, in finding user attribution evidence, sometimes it is necessary to establish that a particular thing is not present on an electronic device. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f.    I know that when an individual uses an electronic device in furtherance of narcotics crimes, the individual's electronic device may generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

25.    Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

26.    Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve intrusion into a physical location.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

V.    CONCLUSION

27.    Based on my training and experience, and the facts as set forth in this affidavit, there is probable cause to believe that on the DEVICES there exists evidence of crimes.  Accordingly, a search warrant is requested.

WHEREFORE, your deponent respectfully requests that the requested search warrant be issued for THE PREMISES KNOWN AND DESCRIBED AS (1) MOTOROLA i570 CELL PHONE; IMEI NUMBER 001702054896780; (2) SAMSUNG METROPCS, IMEI NUMBER A000001EA04D20; (3) SONY ERICSSON CELL PHONE, SERIAL NUMBER BX900HAA6W; AND (4) MOTOROLA CELL PHONE, ESN NUMBER 80643145 (the "DEVICES").

13

IT IS FURTHER REQUESTED that all papers submitted in support of this application, including the application and search warrant, be sealed until further order of the Court.

PAUL STRAFACI
Task Force Officer
Drug Enforcement Administration

Sworn to before me this
14th day of November, 2013

14

## ATTACHMENT A
Property to Be Searched

      The property to be searched is a (1) MOTOROLA i570 CELL PHONE; IMEI NUMBER 001702054896780; (2) SAMSUNG METROPCS, IMEI NUMBER A000001EA04D20; (3) SONY ERICSSON CELL PHONE, SERIAL NUMBER BX900HAA6W; AND (4) MOTOROLA CELL PHONE, ESN NUMBER 80643145, hereinafter the "Devices." This warrant authorizes the forensic examination of the Devices for the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT B**
Particular Things to be Seized

All information obtained from the Devices will be maintained by the government for the purpose of authentication and any potential discovery obligations in any related prosecution. The information shall be reviewed by the government only for the purpose of identifying and seizing all information described below that constitutes fruits, evidence and instrumentalities of a conspiracy to distribute and possess with the intent to distribute narcotics, in operation since approximately January 2008, in violation of Title 21, United States Code, Sections 841 and 846, including:

1.      All records and information on the Devices described in Attachment A, including names and telephone numbers, as well as the contents of all call logs, contact lists, text messages, emails (including those sent, received, deleted and drafted), instant messages, photographs, videos, Facebook posts, Internet activity (including browser history, web page logs, and search terms entered by the user), and other electronic media constituting evidence, fruits or instrumentalities of a conspiracy to distribute and possess with the intent to distribute narcotics, in operation since approximately January 2008, in violation of Title 21, United States Code, Sections 841 and 846;

2.      Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as, for example, logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3.      Evidence of the times the Devices were used;

      4.     Passwords, encryption keys, and other access devices that may be necessary to access the Devices; and

      5.     Contextual information necessary to understand the evidence described in this attachment, all of which constitute evidence, fruits and instrumentalities of a conspiracy to distribute and possess with the intent to distribute narcotics, in violation of Title 21, United States Code, Sections 841 and 846.

      As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

2